Lockwood Myrick v. Commissioner.
Myrick v. Commissioner
Docket No. 52944.
United States Tax Court
T.C. Memo 1956-10; 1956 Tax Ct. Memo LEXIS 282; 15 T.C.M. (CCH) 43; T.C.M. (RIA) 56010; January 19, 1956
*282 Lockwood Myrick, 459 Park Drive, Boston, Mass., pro se. Frank V. Moran, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion Respondent has determined a deficiency in federal income taxes against petitioner for the year 1952 in the sum of $221.22. Petitioner has alleged errors with regard to this determination as follows: (a) the "disallowance as non-business bad debt for losses incurred in helping patients in and from mental hospitals, and (b) disallowance as non-business bad debt for an uncollectible note or contract to pay your petitioner the sum of $628.01, of which amount $370.51 was for expenses incurred by your petitioner in helping a particular patient from a mental hospital." Findings of Fact Petitioner lives in Boston, Massachusetts, and filed his individual income tax return for the taxable year with the director of internal revenue for the district of Massachusetts. Petitioner is a machinist. Since 1943 he has been trying to help mental patients in and from state hospitals. He has an understanding with the patients whom he decides to help that if he succeeds in obtaining freedom for them they will repay or reimburse petitioner *283 for all his actual expenses incurred by him in their behalf including any time that he may have lost from his own employment. If he obtains their freedom, his practice is to pay their expenses, including room and board, and to advance to them spending money for one month while they are getting on their feet. Petitioner has never made any profit from this activity but has lost therefrom many hundreds of dollars. Subsequent to the taxable year, petitioner, in addition to his work as a machinist, established a home for mental patients at his present address, where he charges them $5 a week room rent, and $7 or $8 a week board. In connection with his activity in helping patients to obtain their release from mental hospitals, petitioner made expenditures on behalf of one Helen Clay in 1949 in the amount of $7.58, on behalf of one Steven Arakelian in 1949 in the amount of $76.15, on behalf of one Ernest C. Stinson in 1949 and 1950 in the amount of $42.75, on behalf of one Daniel O'Connor in 1949 in the amount of $45, on behalf of one Leonard Armstrong in 1950 in the amount of $82.12, on behalf of one Nils Nelson in 1946 and 1947 in the amount of $10.00, and on behalf of one Harry Dangovian *284 in the years 1951 and 1952 in the amount of $12.41. Petitioner has not seen Helen Clay since 1949. Steven Arakelian in 1949 and 1950 refused to repay any money to petitioner. In 1950 Arakelian was returned to the state hospital and petitioner has not seen him since. Ernest C. Stinson was an alcoholic. He was returned to the state hospital in 1950. Since then he has been released from the hospital several times and later returned on account of drunkenness. Petitioner saw him in 1954 when he attempted to induce petitioner to advance him more money. With regard to Stinson petitioner testified: "* * * I think I could perfectly well have claimed the debt a deduction a year earlier than I did, but, as I said, when a man is being released once or twice a year you don't know when he is going to make good, or whether he is going to make good or not." Petitioner has not seen Daniel O'Connor since 1949 or 1950 when he was returned to the state hospital. Petitioner made no effort to collect money from him in 1950. Leonard Armstrong was and is an alcoholic. Petitioner continues to see him "every little while" and occasionally is "soft hearted enough to take him in for a few days, but *285 he invariably disappears the minute he gets his pay. * * * Once when he had a job he agreed to pay [petitioner] $5 a week until he got his debts paid up, but he didn't even make one payment." Whenever petitioner has seen him since 1950 he tries "to get something out of him, but he never comes around except when he is dead broke." [1]
Nils Nelson is also an alcoholic. He repaid petitioner $15 in 1949. Since 1947 he has been released from and returned to the state hospital several times. He was in the state hospital in 1952 but petitioner does not recall seeing him in that year. In 1952 Harry Dangovian had "very brief" jobs dishwashing in restaurants. Petitioner "helped him out two or three times" but finally told Dangovian that he would not give any more credit to him until he had paid petitioner what he owed him, with the result that he disappeared and petitioner has not seen him since. Petitioner has made no attempt to locate him or to collect on this account since he disappeared in 1952. In 1950 petitioner was instrumental in *286 obtaining the discharge from the Grafton State hospital of one Lloyd E. Ritchie. In this connection petitioner paid lawyers' fees of $101.51. After Ritchie's discharge he came to Boston where petitioner fitted him out with clothes and supported him during the summer. On September 21 he attacked petitioner without warning and disappeared for a few months returning to Boston in time for Christmas. Petitioner thereupon paid $50 to Ritchie so that he could join a Union and obtain a job. Shortly afterwards in 1951 petitioner insisted that he return some clothes he "had lent him, and he didn't like that." Petitioner then decided to take up the matter of his "debt" with the Executive Secretary of Ritchie's union. At the latter's instance Ritchie signed a document which reads as follows: "I, Lloyd E. Ritchie, do hereby agree to pay Lockwood Myrick, now of 179 West Brookline Street Boston 18, Mass., two-thirds of my net wages each week in excess of twenty dollars ($20.00), or any lesser amount agreed to in writing by and between said Myrick and me, at the same time showing him my pay envelope or other evidence of my net wages, within forty-eight hours after I have received said net wages, *287 until I have paid him the sum of six hundred and twenty-eight dollars and one cent ($628.01), the said $628.01 representing the expense which said Myrick incurred in obtaining my discharge from the Grafton State Hospital, North Grafton, Mass., in supplying me with room, board, clothes, and spending money, in getting an X-ray of his rib which I allegedly broke on September 21, 1950, and surgical treatment therefor, in advancing my initiation fee to Building & Construction Laborers Union Local 223, and other such expenses, as well as the loss in wages which said Myrick suffered as a result of my assaulting him on September 21, 1950, and allegedly breaking one of his ribs, and damages therefor. "In the event of my failing to meet the terms of this agreement, I agree that the full amount of my said indebtedness to said Myrick shall become immediately due and payable, and in such event I do hereby authorize and empower my employer Vara Construction Company, 718 Huntington Avenue, Boston, or any subsequent employer whom I may have, to deduct two-thirds of my net wages each week in excess of twenty dollars ($20.00), or any lessor amount agreed to in writing by and between my then employer *288 and said Myrick, and to pay the amount so deducted to said Myrick, until a total of $628.01 has been so paid him by me or in my behalf." At the time Ritchie signed this document he was without employment but petitioner got him a job and Ritchie paid petitioner $3 out of his first wages. When Ritchie failed to pay petitioner any amounts on his next two pay days, petitioner went to Ritchie's employer to attach his wages but found that Ritchie was no longer working. This was in March 1951. In May 1951 Ritchie attacked petitioner's landlady and stole $11. Thereupon he disappeared for a few weeks, returning to Boston with an infected finger which kept him from working. Once again petitioner supplied Ritchie with room and food while his finger was healing. Some time later Ritchie got a job and one week paid petitioner $5 and paid the robbed landlady $6. Ritchie was to make another payment to petitioner the next pay day but "quit his job the day earlier and collected his pay and instead of turning any of it over to [petitioner] he came into [petitioner's] room in [his] absence and disappeared with a pair of [petitioner's] trousers." Thereupon, petitioner "thought that was going *289 too far", so he obtained Ritchie's commitment to the Grafton State Hospital. Petitioner was of the opinion that Ritchie needed psychotherapy and therefore had him transferred on August 28, 1951, to the Boston Psychopathic Hospital. There Ritchie became interested in some woman. Since she was well educated, Ritchie professed a desire to continue with his own education so petitioner paid Ritchie's matriculation fee at the Lincoln Preparatory School and $13.25 for his books. Ritchie was released from the hospital on September 21, 1951. He obtained "some kind of a job" but paid petitioner nothing. Shortly after his release, Ritchie came to petitioner's room and attacked petitioner's roommate without warning. A few weeks later he came to petitioner's room and "faked an attempted suicide." In November 1951 Ritchie was sent to the Medford State Hospital, where he remained throughout 1952 except for about a week in November 1952 when he escaped but was quickly recaptured. After Ritchie's commitment to the Medford State Hospital in November 1951, "he had no assets, he had no money at all, and he didn't have a job." [2]
*290 Opinion KERN, Judge: Respondent contends that the expenditures made by petitioner in connection with his activities in "helping patients in and from mental hospitals" were gratuitous and did not result in actual debtor-creditor relationships. Petitioner, on the other hand, contends that they constituted non-business bad debts deductible under subsection 23(k)(4) of the Internal Revenue Code of 1939. [3]
The peculiar nature of the circumstances surrounding the expenditures of petitioner here in question might make it difficult to fit them with certainty into any definite legal category. However, that is *291 not necessary, in our opinion, since, even if we assume that petitioner is correct in his contention that they constitute non-business bad debts, we must nevertheless hold that they are not deductible in the taxable year 1952. The quoted subsection of the Internal Revenue Code of 1939 permits the deduction of a non-business bad debt if it "becomes worthless within the taxable year." It is therefore necessary for petitioner to prove that the debts in question had some worth during or immediately prior to the taxable year and that some event occurred during the taxable year which caused or demonstrated their worthlessness. The record in the instant case demonstrates that these debts, assuming they are debts, were just as worthless before 1952 as they were in 1952. Decision will be entered for respondent. Footnotes
1. With regard to Armstrong petitioner testified: "* * * he is really a fine grain sort of fellow, but he has become almost a deadbeat by now."↩
2. Petitioner characterized Ritchie as "one of the most maladjusted fellows I have ever come across."↩
3. Sec. 23(k) Bad Debts. - * * *
(4) Non-business debts. - In the case of a taxpayer, other than a corporation, if a non-business debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. The term "non-business debt" means a debt other than a debt evidenced by a security as defined in paragraph (3) and other than a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. * * *↩